**SPRINGFIELD LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, Appellee,**

v.

**OHIO ASSOCIATION OF PUBLIC SCHOOL EMPLOYEES,
LOCAL 530, et al., Appellants.**

[Cite as *Springfield Local School Dist. Bd. of Edn. v. Ohio Assn.
of Pub. School Emp., Local 530* (1995), 106 Ohio App.3d 855.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 17128.

Decided Oct. 18, 1995.

856

858

*Johnson, Balazs & Angelo* and *Michael Angelo*, for appellee.

*Lucas, Prendergast, Albright, Gibson & Newman, Michael D. Bridges* and *James E. Melle*, for appellants.

SLABY, Judge.

Appellant, the Ohio Association of Public School Employees, Local 530 (the "union"), appeals from the entry of summary judgment in favor of appellee, Springfield Local School District Board of Education (the "board"). We affirm in part and reverse in part.

In early fall of 1992, Dr. Tucker Self, the then-new Superintendent for the Springfield, Ohio school system, attended a meeting of local superintendents where he learned of a company called Settle Service, Inc. ("Settle"). Settle specialized in the provision of bus transportation services under private contracts with school districts. At that time, the board employed union bus drivers and mechanics. Dr. Self arranged a meeting with Peter Settle in late September to discuss the privatization of bus services. Dr. Self provided to Mr. Settle, in mid-October, a copy of the union contract and a cost worksheet to enable preparation of a cost comparison study. Dr. Self advised the board through the "Board Bits," a weekly or semiweekly publication prepared by him about daily operations, that he was "looking at" the concept of contracting bus transportation and would keep them advised. When Dr. Self received a summary proposal from Settle in mid-November, he forwarded copies to the individual board members for their review.

Dr. Self reminded the board members in early January that negotiations were beginning and that they should review the proposal for the special meeting to be held on January 18, 1993. At that meeting, the board went into an executive session without stating a reason for the session in the minutes. Mr. Settle was present at the executive session. The parties dispute the extent to which the Settle proposal, versus the concept of contracting bus services generally, was discussed. One board member testified in deposition that Mr. Settle answered

questions about all parts of the proposal, including finances, bus leasing, safety, and use of school facilities, as well as employee matters.

In March 1993, Dr. Self advised the union that the board was "prepared to commence negotiations over both the decision to subcontract its transportation services and the [e]ffects of such subcontracting." At about this time, Dr. Self advertised for proposals from other companies to provide the service. He also began a campaign to advise the parents and community of what he perceived as the advantages of private bus contracting. The issue became extremely controversial in the community. The record is replete with evidence of community debate and concern. The public conveyed opinions to the various board members and Dr. Self through personal conversations, letters and attendance at board and other community meetings.

Negotiations between the board and the union formally commenced on May 3, 1993. On this date, Dr. Self also received a detailed proposal from Settle, including a tentative contract. He gave this proposal, along with a proposal from Ryder Transportation Company, the only other company to respond to advertisements, to the board on May 13, 1993. Both proposals were made available to the public. The Ryder proposal did not meet the advertised specifications. The Settle proposal deviated from its original proposal as a result of discussions between Dr. Self, Ron Swartz, who was the school district treasurer, and Mr. Settle. Dr. Self explained in deposition that he brought the concerns of the individual board members and public to Settle's attention. Settle, in turn, addressed those concerns and made revisions to the contract where necessary. This process continued roughly through July 1993. A revised contract was submitted to the board along with the July 26, 1993 Board Bits. Negotiations between the board and the union then came to a standstill.

On August 3, 1993, the board held an executive session "to discuss personnel." Mr. Settle was again present to answer the board members' questions. Although again disputed, the record includes testimony that Mr. Settle and the board spoke about bus ownership, Settle's safety and inspection records, and the bus drivers' continued employment by the school system. On August 19, 1993, Mr. Settle, another Settle representative, and the individual board members met in prearranged, closed meetings, held in succession, to discuss any remaining concerns or questions. On that same date, Settle wrote a letter to Dr. Self and the board that referenced the "Board's affirmative decision" to implement contract busing and the need to immediately commence a community outreach effort.

The collective bargaining agreement between the board and the union expired on August 31, 1993. On August 30, 1993, the union had filed its notice of intent to strike. Finally, on September 13, 1993, after an executive session but in an open session, the board voted, three to two, to adopt a resolution that permitted Dr.

Self to enter into a contract with Settle upon the fulfillment of the board's collective bargaining obligations. The resolution further abolished the job classifications of bus driver and bus mechanic to be effective when the contract became effective. On October 11, 1994, the board executed the contract with Settle.

The board filed this action on September 14, 1993, to obtain a temporary restraining order that would limit and regulate the picketing of the striking workers. The trial court granted a temporary restraining order on that day. The union responded with a counterclaim in which it sought declaratory and injunctive relief that would invalidate the resolution and thereby preclude the execution of a contract with Settle or, if already executed, would nullify it. The union alleged that it was entitled to the requested relief because the resolution resulted from deliberations conducted in an executive session in violation of R.C. 121.22, commonly known as the "Sunshine law."

The board moved for summary judgment on the counterclaim; the union moved for a preliminary injunction but did not request summary judgment. Discovery commenced. The trial court limited discovery of executive session discussions concerning the labor negotiations, but allowed discovery of discussions about the Settle proposal. After a hearing and extensive briefing, the trial court granted summary judgment to the board.

The union appeals and assigns four errors.

### Assignment of Error I

"The trial court erred as a matter of law when it granted [the board]'s motion for summary judgment."

■ In reviewing a trial court's entry of summary judgment, an appellate court applies the same standard used by the trial court. *McConville v. Jackson Comfort Sys., Inc.* (1994), 95 Ohio App.3d 297, 642 N.E.2d 416. In order to grant summary judgment pursuant to Civ.R. 56(C), a trial court must first decide that:

"(1) [N]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party." *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192; see, also, *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273–274.

■ The moving party has the burden of showing that summary judgment is appropriate, but need not produce evidence negating every element of the opponent's claim. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801–802; *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 323, 106 S.Ct. 2548,

2552–2553, 91 L.Ed.2d 265, 274. The nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial and, when the moving party has supported his motion with proper evidence, must respond with evidence that sets forth specific facts showing a genuine issue of fact. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus; *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 51, 567 N.E.2d 1027, 1030–1031. If the nonmoving party can offer only a scintilla of evidence, or if his evidence is merely colorable or not significantly probative, then the moving party is entitled to judgment as a matter of law. *Buckeye Union Ins. Co. v. Consol. Stores Corp.* (1990), 68 Ohio App.3d 19, 22, 587 N.E.2d 391, 393.

R.C. 121.22 states:

"(A) This section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings, unless the subject matter is specifically excepted by law.

" * * *

"(B) As used in this section:

" * * *

"(2) 'Meeting' means any prearranged discussion of the public business of the public body by a majority of its members.

" * * *

"(C) All meetings of any public body are declared to be public meetings open to the public at all times. * * *

" * * *

"(H) A resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body. A resolution, rule, or formal action adopted in an open meeting that results from deliberations in a meeting not open to the public is invalid unless the deliberations were for a purpose specifically authorized in division (G) of this section and conducted at an executive session held in compliance with this section. * * * "

The intent of the Sunshine law is to require governmental bodies to deliberate public issues in public. *Moraine v. Montgomery Cty. Bd. of Commrs.* (1981), 67 Ohio St.2d 139, 145, 21 O.O.3d 88, 91–92, 423 N.E.2d 184, 188. A violation of the open-meeting requirement, or of the notice provision, is a predicate to invalidation of any legislative action. *Barbeck v. Twinsburg Twp.* (1992), 73 Ohio App.3d 587, 595, 597 N.E.2d 1204, 1209–1210; R.C. 121.22(F). There must be evidence in the record that the public body arrived at its decision

on the action *as a result of* nonpublic *deliberations* that occurred in executive session. *Moraine,* 67 Ohio St.2d at 145, 21 O.O.3d at 91–92, 423 N.E.2d at 188.

■■ "Deliberations" involve more than information-gathering, investigation, or fact-finding. *Holeski v. Lawrence* (1993), 85 Ohio App.3d 824, 829, 621 N.E.2d 802, 805. Webster's Third New International Dictionary (1961) 596, defines "deliberation" as "the act of weighing and examining the reasons for and against a choice or measure" or "a discussion and consideration by a number of persons of the reasons for and against a measure." Question-and-answer sessions between board members and other persons who are not public officials do not constitute "deliberations" unless a majority of the board members also entertain a discussion of public business with one another. *Holeski,* 85 Ohio App.3d at 830, 621 N.E.2d at 806. In this context, a "discussion" entails an "exchange of words, comments or ideas *by the board.*" (Emphasis *sic.*) *Id.,* citing *DeVere v. Miami Univ. Bd. of Trustees* (June 10, 1986), Butler App. No. CA86–05–065, unreported, 1986 WL 6763. A conclusive decision among board members on any measure, however, is not necessary to prove a violation. See *State ex. rel Delph v. Barr* (1989), 44 Ohio St.3d 77, 81, 541 N.E.2d 59, 62–63.

■ In the instant case, the union was required to produce evidence that the board arrived at its decision to authorize a contract with Settle and to abolish the job classifications as a result of deliberations in executive session. The board conceded during oral argument that its members discussed the idea of "contract busing" in executive session. It further stated in a brief filed in the trial court that "the resolution at issue * * * was deliberated in executive session." The board's concessions, however, do not indicate which executive session involved deliberations. Although the union claims "at least seven procedural and/or substantive violations of R.C. 1[2]1.22," it identifies only three "meetings" about which there was testimony that the Settle proposals were discussed. Of these three, two do not present a violation of the open meeting requirement, as a matter of law.

The testimony of all witnesses who were deposed requires the conclusion that the initial meeting that was held on January 18, 1993 was informational only. At this early stage of the board's exposure to and involvement in the idea of privatization, the board was entitled to gather facts from available sources, including a private business entity, without public scrutiny. Nor was there any testimony that this meeting involved anything other than a question-and-answer session with Mr. Settle. There was no evidence of discussion or debate among the board members at this time.

■ The union also argues that the August 19, 1993 meetings between Settle and individual board members violated the Sunshine law. It cites *State ex rel.*

*Floyd v. Rock Hill Local School Bd. of Edn.* (Feb. 10, 1988), Lawrence App. No. 1862, unreported, 1988 WL 17190, in support of its argument. In that case, the Lawrence County appellate court held that one-on-one meetings between the board president and the other board members violated the Sunshine law although a majority of members were not present at any one meeting. We are not presented with the same scenario. The absence of any more than one board member at the prearranged discussions with Settle representatives precluded any exchange of ideas or opinions *between board members.* If we were to accept the union's contention, no public official could entertain a discussion of public business with a member of the community without complying with the requirements of the Sunshine law. We do not believe this to have been the legislature's intention.

 Finally, the board's adjournment into executive session without a stated purpose or with a misstated purpose does not require invalidation of the resolution unless the resolution resulted from deliberations improperly held in the executive session or unless the executive session was not held in compliance with the statute. R.C. 121.22(H). R.C. 121.22(G) sets forth the requirements that must be followed to hold an executive session. There is no allegation that these requirements were not met; therefore, any procedural irregularities do not invalidate the resolution.[1]

 The union did produce evidence that specific aspects of the Settle proposal, including ownership of the buses, safety and inspection records and financing, were discussed at the August 3, 1993 meeting in a closed session. We find that the union, assisted by the board's concessions, met its burden of proof on summary judgment to show that the board "deliberated" in the August 3, 1993 executive session on matters addressed in the resolution.

 Besides the act of deliberation, there must be proof of causation. The Supreme Court of Ohio has held that "public access" is a defense to a claim of noncompliance with the open-meeting requirement. *State ex rel. Randles v. Hill* (1993), 66 Ohio St.3d 32, 35, 607 N.E.2d 458, 461. In *Randles,* the court considered physical access to a meeting. The Supreme Court has also considered public access in the context of causation and has agreed that "the intent of the Sunshine Law, that deliberations concerning public issues be made public, could not be further served by invalidating a decision insofar as such deliberations [are] laid before the public eye." *Moraine,* 67 Ohio St.2d at 145, 21 O.O.3d at 92, 423 N.E.2d at 188. Public access to, and debate of, the subject of deliberations may

---

1. The trial court addressed only whether the resolution was invalidated. Our decision does not foreclose the pursuit of other remedies, on remand, for procedural violations, if proven.

militate against a finding of the causal connection. Where the subject matter of deliberations is an issue of public concern and debate, the mere fact that the subject is raised at an executive session is insufficient to prove that the action was "deliberated to the extent that it was the cause of the public resolution." *Greene Cty. Guidance Ctr., Inc. v. Greene–Clinton Community Mental Health Bd.* (1984), 19 Ohio App.3d 1, 5, 19 OBR 46, 50, 482 N.E.2d 982, 986.

██ The trial court, after noting the public's awareness of the issues, found "no evidence that the Resolution resulted from any discussions or deliberations that occurred in the executive sessions." We disagree. As already noted, there was evidence that at least part of the specific resolution, *i.e.*, the Settle contract, was deliberated in the August 3, 1993 executive session. This evidence was sufficient to raise an inference that the discussions contributed to the board's decision to adopt the resolution. See *id.* Although the evidence that the issues were made public militates against finding causation, for purposes of summary judgment we must draw all inferences in favor of the union as the nonmoving party. We find, therefore, that the union also met its initial burden of production to show that authorization of the contract resulted from the August 3, 1993 deliberations.

██ Once evidence has been produced that a public body held deliberations that resulted in formal action violating R.C. 121.22(C), the open-meeting requirement, the public body can defend upon the basis that the subject matter discussed was specifically excepted from the open-meeting requirement by R.C. 121.22(G), which enumerates six different subject areas that are properly deliberated in executive session. In this summary judgment proceeding, the burden was on the board to produce evidence that its discussions fell within the exception. See *State ex rel. Bond v. Montgomery* (1989), 63 Ohio App.3d 728, 736, 580 N.E.2d 38, 43–44, citing *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1988), 38 Ohio St.3d 79, 526 N.E.2d 786, paragraph two of the syllabus. The board claimed that R.C. 121.22(G)(4) applied. That subsection states:

"The members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold such a session and only at a regular or special meeting for the sole purpose of the consideration of any of the following matters:

" * * *

"(4) Preparing for, conducting, or reviewing negotiations or bargaining sessions with public employees concerning their compensation or other terms and conditions of their employment[.]"

The parties do not dispute that privatization of services previously rendered by members of a bargaining unit to persons outside the unit is a mandatory subject

for collective bargaining. See *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 533 N.E.2d 264, paragraph three of the syllabus. Instead, the board has consistently characterized its discussions as concerning "subcontracting," "privatization" or "contract busing," so as to arguably fall within the negotiations exception, whereas the union characterized the discussions as concerning the "Settle Proposal," a business matter not covered by any exception. The trial court held that the issues were "inextricably linked" and were properly discussed under the negotiations exception.

We disagree with the focus of this inquiry. The issue to be decided is whether the specific action taken in the resolution resulted from discussions that could properly be held in executive session. The resolution authorized two distinct actions: the execution of a contract with Settle to provide bus transportation services and the abolition of the bus drivers' and mechanics' job classifications. We do not find that either these actions or the considerations underlying their adoption were "inextricably linked." The board could have separated its discussion of the business matters from its discussion of the labor implications of privatization. The board could properly discuss financing, bus leasing, safety and the use of the school facilities only in open session. On the other hand, the board could properly discuss negotiations over continued union representation, continued employment of current drivers, and other terms of that employment in closed session under the negotiations exception.

Accordingly, we partially sustain the union's first assignment of error. An issue of fact remains to be decided whether the deliberations conducted in the closed session held on August 3, 1993, resulted in the board's resolution authorizing execution of a contract with Settle. We, therefore, remand the case for further proceedings on that issue. We do not remand, however, for any further consideration of whether the board's deliberations in executive session resulted in its resolution to abolish the job classifications. The trial court properly entered summary judgment on this issue; the board's formal action abolishing the job classifications was separable from the business decision to enter into the Settle contract, as were the reasons underlying these actions.[2] Moreover, even if we assume that the board discussed the elimination of job classifications in meetings closed to the public, R.C. 121.22(G)(4) excepted those discussions from the open meeting requirement.

The union's first assignment of error is sustained in part and overruled in part.

---

**2.** We recognize that, pursuant to the resolution, the board abolished the job classifications "on the date the contract provided for in Section 1 of this Resolution [became] effective." We do not express any opinion on the impact of a future order, if any, that invalidates Section 1 of the resolution because that issue is not ripe for our review.

### Assignment of Error IV

"The trial court committed prejudicial error when it granted [the board]'s motion for protective order because there is no testimonial privilege regarding executive session discussions."

■ The trial court, after determining that there was no "*per se*" privilege that protects executive session discussions, limited the union's discovery by granting the board a protective order:

"[T]he Court denies Plaintiff's motion for a protective order to the extent that it seeks to avoid disclosure of all matters discussed at the subject executive sessions and all documents related to the outsourcing of student transportation services. Plaintiff is hereby ordered to fully cooperate in discovery as it relates to disclosure of discussions and documents regarding deliberations on the resolution to subcontract student transportation to Settle Services. Defendants, however, are prohibited from deposing Board members on matters pertaining to collective bargaining proposals, negotiations and strategies with regard to outsourcing of student transportation services. Document production is similarly restricted insofar as the documents relate to or contain collective bargaining preparations, proposals, negotiation strategies, or summaries of such matters."

The union argues that, absent a privilege, the information was discoverable. The board argues that the court properly exercised its discretion to regulate and limit discovery under Civ.R. 26(C). We agree that there is no absolute privilege to be accorded discussions held in executive session and that a trial court, in its discretion, may limit discovery; nonetheless, we find that the court overstepped the boundaries of its discretion by placing too great a limitation on the ability of the union to obtain discovery under the circumstances of this case.

■ No person has a privilege to refuse to testify or produce a document upon request in a judicial proceeding unless the Constitution, a statute or case law provides otherwise. Evid.R. 501; see, also, *In re Frye* (1951), 155 Ohio St. 345, 44 O.O. 320, 98 N.E.2d 798, paragraph one of the syllabus. This rule applies to all stages of the proceeding, including discovery. Evid.R. 101(B). The board cites no Ohio statute or case law that expressly creates an evidentiary privilege for matters discussed in an executive session under any of the exceptions to the open meeting requirement. The absence of a legislative enactment or previous judicial ruling creating such a privilege, however, does not itself foreclose our formulation and application of such a privilege if justice so requires.

■ A privilege is "a personal right, *i.e.*, the right to preserve the confidentiality of certain private communications. * * * Privilege law, then, is anchored in considerations of policy that exist independently of the usual evidentiary concerns with accuracy and reliability of evidence. Privileges operate to sup-

press competent, relevant evidence in order to preserve confidential relationships." (Footnotes omitted.) 1 Weissenberger, Ohio Evidence (1995) 4, Section 501.3.

To decide whether a privilege should apply, we must balance the public's interest in confidentiality against the need for discovery in the efficient administration of justice. See *Henneman v. Toledo* (1988), 35 Ohio St.3d 241, 245–246, 520 N.E.2d 207, 211–212.

■ The legislature has manifested an interest in protecting the privacy of the collective bargaining process through statutes that prohibit or limit public access to that process. R.C. 4117.21 provides: "Collective bargaining meetings between public employers and employee organizations are private, and are not subject to section 121.22 of the Revised Code." R.C. 121.22(G) extends the privacy to meetings of public bodies that are conducted to discuss not only pending negotiations, but also preparation for and review of those negotiations. The provision of the Sunshine law that does not require minutes to be made of executive session discussions precludes public access to records of discussions concerning negotiations, after the fact. These minutes would otherwise be available to the public under R.C. 149.43, the public records statute. Although these provisions suggest a strong policy against public disclosure of the deliberations underlying negotiations, the provisions protect only against access to the general public. They do not necessarily protect against disclosure in the course of litigation upon a proper discovery request, if the information is otherwise discoverable. See *Henneman*, 35 Ohio St.3d at 245, 520 N.E.2d at 211.

In *Henneman*, the Supreme Court of Ohio determined that a police department's internal affairs investigatory records were not protected by an absolute privilege against discovery, even though they were protected from public disclosure under the public records statute. Nevertheless, the court recognized that the need to maintain confidentiality justified heightened supervision over the discovery process by the trial court through *in camera* inspection. The need for confidentiality and privacy in the collective bargaining process warrants similar protection.

R.C. Chapter 4117 is to be construed to "promot[e] orderly and constructive relationships between all public employers and their employees." R.C. 4117.22. The very existence of a successful working relationship between labor and management is dependent upon the ability to negotiate freely in the spirit of compromise, toward which the collective bargaining process strives. Disclosure of the public employer's internal discussions concerning negotiations, including its strategies, options and proposals, whether accepted or rejected, could seriously endanger the success of pending negotiations or otherwise give an unfair advantage to the bargaining agent for the employees. This impact may not be limited

only to pending negotiations; for example, knowledge of the employer's bottom-line figures in the negotiation of one year's contract may dictate the course of action taken by the union in the next year's negotiations. Moreover, the prospect of future public disclosure through court records may, for fear of public recrimination, impede the uninhibited expression of opinion and exchange of ideas necessary to arrive at an acceptable proposal or strategy.

A trial court has broad discretion to regulate discovery proceedings. *Manofsky v. Goodyear Tire & Rubber Co.* (1990), 69 Ohio App.3d 663, 668, 591 N.E.2d 752, 755, citing *State ex rel. Daggett v. Gessaman* (1973), 34 Ohio St.2d 55, 63 O.O.2d 88, 295 N.E.2d 659, paragraph one of the syllabus. Pursuant to Civ.R. 26(C), the court may limit discovery to protect against the abuse of the discovery process. *Arnold v. Am. Natl. Red Cross* (1995), 93 Ohio App.3d 564, 575, 639 N.E.2d 484, 491. In the instant case, the trial court acknowledged the countervailing considerations between the union's need for disclosure of executive session discussion to enable it to prove the suspected violation of the Sunshine law and the board's need to maintain the secrecy of its ongoing discussions over the labor negotiations. The court erred, however, in fashioning an order that vested counsel for the board with the ultimate authority to decide which information was protected from disclosure as "pertaining to collective bargaining proposals, negotiations and strategies with regard to outsourcing of student transportation services."

On remand, further discovery of matters in which the board has asserted a confidentiality interest is to be permitted in accordance with the procedure outlined in *Henneman*, 35 Ohio St.3d at 243–244, 520 N.E.2d at 209–211, for *in camera* inspection. The trial court, or the parties by stipulation, may use any method of discovery that will both preserve the record for review and permit the trial court to examine the responses prior to disclosure, if any, to opposing counsel. The trial court must review the responses to determine whether the union's interest in discovery outweighs the public interest in confidentiality of the information.[3]

The union's fourth assignment of error is well taken.

### Assignments of Error

"II. The trial court erred as a matter of law in failing to construe strictly the R.C. 121.22(G)(4) exemption from the open meetings requirement of the 'Sunshine law.' "

---

**3.** Discovery requests may still be objectionable on other grounds, either pursuant to Civ.R. 26(C) or other applicable privilege. See *Henneman*, 35 Ohio St.3d at 246, 520 N.E.2d at 212; *In re Dismissal of Osborn* (Aug. 20, 1992), Ashland App. No. CA–1009, unreported, 1992 WL 214527; *Village Square Nursing Ctr., Inc. v. Orwell* (Dec. 31, 1986), Ashtabula App. No. 1265, unreported, 1986 WL 14948.

"III. The trial court erred in failing to grant [the union]'s motion for preliminary injunction."

We consider it unnecessary to address the remaining assignments of error because of our decision to remand the case to the trial court for further proceedings in accordance with this opinion. See App.R. 12(A)(1)(c). The union's second and third assignments of error are overruled.

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded to that court for proceedings consistent with this opinion.

*Judgment accordingly.*

REECE, P.J., concurs.

DICKINSON, J., concurs in part and dissents in part.

DICKINSON, Judge, concurring in part and dissenting in part.

I concur in the majority's conclusion that summary judgment was not appropriate regarding the August 3, 1993 meeting. The union established that there were genuine issues of material fact regarding whether the executive session held on that date was a violation of the Sunshine law and whether there was a causal connection between that claimed violation and the adoption of the resolution that authorized the superintendent to enter into a contract with Settle.

I also concur in the majority's conclusion that the discussions between individual board members and Peter Settle on August 19, 1993 were not violative of the Sunshine law. My reason for agreeing with that conclusion, however, is that a majority of the board was not present at any of those discussions and, therefore, they were not "meetings" within the meaning of R.C. 121.22(B)(2).

I dissent from that part of the majority's judgment by which it has concluded that the union failed to establish a genuine issue of material fact regarding whether the January 18, 1993 meeting was a violation of the Sunshine law. A ruling that all the board members may sit together in a closed room and ask questions of a witness regarding public business and not violate the Sunshine law so long as the board members avoid directly addressing each other is not "liberally construing" the Sunshine law "to require public officials * * * to conduct all deliberations upon official business only in open meetings." As is clear from the definitions quoted by the majority, deliberations not only include "discussions," they also include "consideration by a number of persons of the reasons for and against a measure" and "the act of weighing and examining the reasons for and against a choice or measure." This seems an accurate description of what occurred at the January 18, 1993 meeting.

I concur with the remainder of the majority opinion.