PIEKUTOWSKI et al., Appellees,

v.

SOUTH CENTRAL OHIO EDUCATIONAL SERVICE CENTER GOVERNING BOARD et al., Appellants.

[Cite as *Piekutowski v. S. Cent. Ohio Educational Serv. Ctr. Governing Bd.*, 161 Ohio App.3d 372, 2005-Ohio-2868.]

Court of Appeals of Ohio,
Fourth District, Adams County.

No. 04CA791.

Decided June 3, 2005.

Bricker & Eckler L.L.P., Kimball H. Carey, and Dane A. Gaschen, for appellant Peebles Local School District Board of Education.

Buckley King, L.P.A., and Donell R. Grubbs, for appellees.

HARSHA, Judge.

{¶ 1} The Peebles Local School District Board of Education appeals from a judgment invalidating the resolution that created the school district. The board of education contends that the court erred in concluding that the South Central Ohio Educational Service Center Governing Board ("ESC") violated Ohio's Sunshine Law, R.C. 121.22, when it adopted the resolution. The board argues that ESC did not engage in unlawful deliberations during the executive session on October 21, 2002. Moreover, the board argues that even if it did, the resolution proposing the creation of the new school district did not result from those deliberations.

{¶ 2} After reviewing the record, we conclude that there is some competent, credible evidence to support the court's finding that ESC deliberated on the school-district issue in executive session. Board member Hansgen's testimony indicates that the members of the board discussed the issue and shared their opinions on it during the executive session. Moreover, there is some basis in the record to support the trial court's conclusion that the resolution resulted from the nonpublic deliberations. The paucity of public discussion by ESC about the new school district, board member Hansgen's testimony that the board members discussed the issue during the executive session, the fact that many of the board members first received the financial information about the school district in the executive session, and the board members' testimony that they based their decision on that financial information all provide evidentiary support for the trial court's conclusion that the resolution resulted from nonpublic deliberations. Thus, we must conclude the court did not err in invalidating it.

{¶ 3} The board of education also argues that the trial court erred in concluding that the resolution was invalid because the map attached to the resolution was not "an accurate map of the territory affected" as required by R.C. 3311.26. Since we affirm the trial court's determination that the resolution creating the Peebles Local School District is invalid, we need not decide whether ESC complied with the requirements of R.C. 3311.26 when it adopted the resolution. Accordingly, we affirm the trial court's judgment.

{¶ 4} In August 2002, ESC accepted a proposal that requested the creation of a new local school district ("Peebles proposal").[1] ESC directed Superintendent Jenkins to review the proposal and report back to the board.

---

1. Under the former version of R.C. 3311.26, governing boards of educational service centers had the authority to create new local school districts. 1995 Am.Sub.H.B. No. 117. The

{¶ 5} In early October, ESC sponsored a public forum on the Peebles proposal. Subsequently, on October 7, ESC held its regular board meeting, during which ESC went into executive session to review legal communications from its attorney. After reviewing the attorney's letter, the board began to discuss the Peebles proposal. At that time, Superintendent Jenkins informed the board that he had yet to receive the state revenue simulation ("SF–3") for the proposed school district from the Ohio Department of Education. Since the board did not have the SF–3, board member Hansgen suggested that the board table the proposal. The other board members agreed, and after returning to the public session, ESC adopted a resolution tabling the Peebles proposal. The resolution stated that ESC would decide the issue of the proposed school district at a special meeting on October 21, 2002.

{¶ 6} At the October 21 meeting, ESC again went into executive session. The minutes of the meeting state that ESC went into the executive session to review legal communications from its attorney. However, an audio recording of the meeting indicates that ESC went into the executive session "for the purpose of considering the * * * Peebles community proposal [inaudible] school district." During the executive session, the board members received a packet of financial information about the proposed school district, including the SF–3 from the Ohio Department of Education. Superintendent Jenkins, Treasurer Riehls, and Mr. Taylor of the Ohio Department of Education explained the financial information to the board and answered the board member's questions. What occurred next is the subject of dispute. Appellees allege that the members of the board discussed the Peebles proposal among themselves while in the executive session. Appellant, however, denies that the board deliberated on the issue of the proposed school district in the executive session. When the board returned to the public session, it adopted a resolution proposing the creation of the Peebles Local School District.

{¶ 7} After adopting the resolution, ESC learned that the description of the school district contained in the resolution did not conform to the map attached to it. Thus, at its next regular meeting, ESC adopted a corrected resolution, which rescinded the previous resolution and once again proposed the creation of the Peebles Local School District. The portion of the corrected resolution proposing the creation of the school district is identical to the earlier resolution, except for the description of the school district.

{¶ 8} After a protracted period of legal maneuvering, the board passed a resolution that created the school district effective January 1, 2004. Almost

current version of the statute, which took effect in September 2003, gives the state board of education the authority to create new local school districts.

immediately, a group of citizens filed a complaint seeking declaratory and injunctive relief against ESC.

{¶ 9} After another series of legal maneuvers, the trial court issued its decision, which found that ESC had deliberated on the issue of the proposed school district in the executive session on October 21. Moreover, the court found that the resolution proposing the creation of the school district resulted from those deliberations. Thus, the court concluded that the resolution and any subsequent resolutions concerning the school district were invalid. The trial court also found that the map attached to the resolution was not an accurate map as contemplated by R.C. 3311.26. The court concluded that ESC's failure to comply with the requirements of R.C. 3311.26 rendered the resolution void.

{¶ 10} Both the Peebles Local School District Board of Education and ESC appealed the trial court's decision; however, ESC subsequently withdrew from the appeal. The Peebles Local School District Board of Education raises the following assignments of error:

## ASSIGNMENT OF ERROR NO. 1

The trial court erred in finding that the exchange of information which occurred during an executive session of the South Central Ohio Educational Service Center Governing Board on 10–21–01 constituted unlawful "deliberations" within the meaning of R.C. 121.22, Ohio's Sunshine Law.

## ASSIGNMENT OF ERROR NO. 2

The trial court erred in finding that the resolution of the South Central Ohio Educational Service Center Governing Board on 11–4–02 proposing the creation of the Peebles Local School District "resulted from" unlawful deliberations at the 10–21–02 meeting within the meaning of R.C. 121.22(H), so as to require the actual invalidation of the official action taken on 11–4–02, such finding being both contrary to law and against the manifest weight of the evidence.

## ASSIGNMENT OF ERROR NO. 3

The trial court erred in granting Plaintiffs relief based on the provisions of R.C. 3311.26, since the trial court itself determined that none of the Plaintiffs could show "that the claimed injury is concrete and particularized" as to them so as to have legal standing.

## ASSIGNMENT OF ERROR NO. 4

The trial court erred as a matter of law in finding that the map referenced by the Education Service Center Governing Board in its resolution of 11–04–02

was not an "accurate map showing the territory affected" within the meaning of R.C. 3311.26.

## ASSIGNMENT OF ERROR NO. 5

The trial court erred as a matter of law in invalidating all proceedings of the South Central Ohio ESC pursuant to R.C. 3311.26 based on the map provision of such statute, where nothing in such statute calls for such result and is inconsistent with the existing statutory scheme under R.C. 5715.19 for resolving issues relating to school district boundaries.

{¶ 11} Because they are related, we will address the board's first two assignments of error together. The board of education argues that the trial court erred in concluding that ESC violated Ohio's Sunshine Law, R.C. 121.22, when it adopted the resolution proposing the creation of the Peebles Local School District. In essence, the board asserts that the trial court's findings are against the manifest weight of the evidence.

{¶ 12} An appellate court will not reverse a judgment as being against the manifest weight of the evidence so long as there is some competent, credible evidence to support the judgment. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. Under this highly deferential standard of review, we do not decide whether we would have reached the same conclusion as the trial court. *Hooten Equip. Co. v. Trimat, Inc.*, Gallia App. No. 03CA16, 2004-Ohio-1128, 2004 WL 444134. Rather, we must uphold the judgment if there is some evidence in the record from which the trial court could have reached its ultimate factual conclusions. Id. We are guided by the presumption that the trial court's factual findings are correct, since the trial judge "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 13} R.C. 121.22(A) requires public officials "to take official action and to conduct all deliberations upon official business only in open meetings unless the subject matter is specifically excepted by law." A resolution is invalid unless adopted in an open meeting of the public body. R.C. 121.22(H). Additionally, "[a] resolution * * * adopted in an open meeting that results from deliberations in a meeting not open to the public is invalid unless the deliberations were for a purpose specifically authorized by division (G) * * *." *Id.* It is undisputed that R.C. 121.22(G) does not permit an educational service center governing board to deliberate on the creation of a new school district in private.

■ {¶ 14} " 'Deliberations' involve more than information-gathering, investigation, or fact-finding." *Springfield Local School Dist. Bd. of Edn. v. Ohio Assn. of Pub. School Emp., Local 530* (1995), 106 Ohio App.3d 855, 864, 667 N.E.2d 458, citing *Holeski v. Lawrence* (1993), 85 Ohio App.3d 824, 829, 621 N.E.2d 802. They involve the weighing and examining of reasons for and against a course of action. Id., citing Webster's Third New International Dictionary (1961) 596. See, also, *Theile v. Harris* (June 11, 1986), Hamilton App. No. C–860103, 1986 WL 6514. Deliberations involve a decisional analysis, i.e., an exchange of views on the facts in an attempt to reach a decision. It is permissible for a public body to gather information in private. But it cannot deliberate privately in the absence of specifically authorized purposes.

■ {¶ 15} At trial, board member Hansgen testified about what occurred during the executive session on October 21, 2002. She stated that after Taylor explained the SF–3 to the board, the board members asked him questions. Hansgen described the question-and-answer session as a "free-for-all." According to Hansgen, the board members interacted with each other and shared their opinions with one another. Hansgen testified that Superintendent Jenkins and Treasurer Riehls also presented financial information to the board during the executive session. She testified that both men opined that the new school district would be viable. Finally, Hansgen testified that at the end of the executive session, the board's president "went around and asked each of us what our opinion was." She testified that each board member gave his or her opinion on the proposal, indicating how he or she would vote. She stated that she knew, leaving the executive session, that the vote on the proposal would be six to one.

{¶ 16} Two other board members, Mr. Piatt and Mr. Howard, testified that ESC discussed the pros and cons of the proposal, although they could not recall whether the discussion occurred in public or in executive session.

{¶ 17} Board members Crabtree and Blanton testified that they did not remember board members discussing the proposal among themselves during the executive session on October 21. In addition, they testified that they did not remember board members voicing their opinion on the proposal. Finally, both men testified that they did not remember the president of the board asking the board members how they would vote.

{¶ 18} Treasurer Riehls testified that the board members did not discuss the pros and cons of the proposal during the executive session on October 21. He testified that Hansgen was the only board member to express her opinions about the proposal. Likewise, Mr. Justice, an ESC employee who was present during the executive session, testified that the board as a whole did not discuss the pros and cons of the proposal. However, Justice acknowledged that during the question-and-answer session with Taylor, there "was probably some discussion, a

little bit, between board members". Finally, Superintendent Jenkins testified that the board members did not conduct a straw vote on the proposal during the executive session on October 21. He testified that although the board members asked questions about the information they received, only Hansgen and Blanton commented on the information. He testified that Hansgen questioned the validity of some of the calculations in the SF–3. Blanton responded that he had done some independent research and his calculations matched those in the SF–3.

{¶ 19} Having reviewed the evidence in the record, we conclude that there is some competent, credible evidence to support the trial court's finding that ESC deliberated on the issue of the proposed school district in executive session. The record indicates that there was very little discussion by the board about the proposal in the public sessions. Following the executive session on October 7, Superintendent Jenkins apologized to the public and explained that the board would be tabling the proposal because it had not yet received some necessary financial information. There was no more discussion about the proposal at that time. After the executive session on October 21, a member of the public gave a presentation about the proposal. ESC then voted on the proposal. Hansgen, the lone dissenter, was the only board member to share her opinions with the public. Given the absence of the board's public discussion about the proposal, the trial court could reasonably have concluded that the board's discussion of the pros and cons occurred during an executive session. If the trial court chose to believe board member Hansgen's testimony, which it was free to do, that evidence establishes that more than mere information-gathering and fact-finding occurred during the executive session. In spite of the fact that several witnesses testified to the contrary, her testimony indicates that the members of the board discussed the proposal and voiced their opinions about the proposal during the executive session. It is the trial court's job, not ours, to determine which version of the events is more credible. Moreover, Piatt's and Howard's testimony appears to support her version of events. Both men testified that ESC discussed the pros and cons of the proposal. And while Piatt and Howard could not remember whether the discussion occurred in public or in an executive session, the trial court could have concluded, based on the absence of public discussion in the record, that it occurred in an executive session.

{¶ 20} In its decision, the court specifically found Hansgen's testimony to be credible, stating that it was "relying more heavily on the facts testified to by Lucinda Hansgen where there is a conflict in the testimony." The board of education takes issue with the trial court's decision to credit Hansgen's testimony. The board asserts that the court "chose to reject the most logical or best-supported result." In its reply brief, the board asks us to "carefully review the transcript and draw its own conclusions as to what the evidence showed." We

are duty-bound to decline the board's invitation to revisit the trial court's credibility determinations where they have some logical basis. As noted above, the trial court is in a much better position to judge the credibility of the witnesses who appear before it. See *Seasons Coal,* supra. The trial court explained its choice to believe Hansgen's version of the events by stating that the other side presented an almost universal chorus of not recalling whether there were private deliberations. The trial court felt that the universal lack of memory might have resulted from a desire to avoid facts that were not beneficial to the board's position. Thus, while we might not agree with it, we are not free to substitute our view of the facts for that of the trial court. Id. Because there is some competent, credible evidence to support the trial court's finding, we must defer to the trial court and conclude that it did not err in finding that ESC deliberated in the executive session on the issue of the proposed school district.

■ {¶ 21} The board of education argues that even if ESC deliberated on the school-district issue in executive session, the court erred in concluding that the resolution proposing the creation of the school district resulted from those deliberations. The board notes that the Peebles proposal "was a matter of public debate over an extended period." It argues that there is no evidence that ESC arrived at its decision as a result of the discussions that occurred in the executive session.

■ {¶ 22} Evidence that a public body deliberated on a public issue in executive session does not automatically result in invalidation of a resolution. "Besides the act of deliberation, there must be proof of causation." *Springfield Local,* 106 Ohio App.3d at 865, 667 N.E.2d 458. Thus, there must be evidence in the record that the public body arrived at its decision on the matter *as a result of* the nonpublic deliberations. Id. at 863–864, 667 N.E.2d 458.

{¶ 23} Having reviewed the record, we must conclude that some evidence supports the trial court's determination that the resolution resulted from nonpublic deliberations. Although board members Hansgen and Blanton received the SF–3 on October 18, the other board members did not receive the financial information until the executive session on October 21. At the October 7 meeting, Superintendent Jenkins informed the public that the board did not feel comfortable making a decision on the Peebles proposal without the financial information. Indeed, the financial implications of the new school district were a matter of great importance to the board. Justice testified that the board had two main concerns: (1) the financial impact that the new school district would have on the existing district and (2) getting the matter before the people for a vote. Board member Piatt testified that he voted in favor of the proposal based on the financial information he received. Board member Howard also testified that he based his decision, in part, on the financial aspects of the proposal. Likewise, Board

member Crabtree testified that the financial aspects of the proposal were a factor in his decision, although they were not the main factor. Finally, Board member Blanton testified that he voted in favor of the proposal because it was "a sound financial situation." However, he testified that he reached this conclusion based on his own independent research.

{¶ 24} Although the financial implications of the proposed school district greatly influenced the board's decision, most of the board members did not receive the financial information until the executive session on October 21. The recording of the public session on October 21 contains no mention of the financial information received by the board. Board member Hansgen testified that the board did not provide the public with a copy of the financial information at the public session.

{¶ 25} Moreover, it appears from the record that there was very little public discussion about the Peebles proposal on the part of ESC. The only public discussion that occurred at the October 7 meeting concerned ESC's reason for tabling the proposal. As for the October 21 meeting, Board member Hansgen was the only board member to comment on the proposal in the public session. The other board members simply expressed their votes in favor of the proposal. The Peebles Board of Education maintains that ESC engaged in a lengthy public discussion about the proposal at its meeting on November 4, 2002. However, according to board member Hansgen, the discussion focused on the reason for the corrected resolution and the effect the corrected resolution would have on the petitions the residents were gathering. She testified that the board did not discuss the financial viability of the school district at the November 4 meeting.

{¶ 26} The Peebles Board of Education argues that the absence of public discussion on ESC's part does not mean that the resolution resulted from nonpublic discussions. The board asserts that the proposal was a matter of general public debate, noting that there were local forums and newspaper coverage about the proposal. It argues that invalidation is inappropriate where lengthy public debate preceded the official action. To support its argument, the board relies on *Greene Cty. Guidance Ctr., Inc. v. Greene–Clinton Community Mental Health Bd.* (1984), 19 Ohio App.3d 1, 19 OBR 46, 482 N.E.2d 982, and *Theile v. Harris* (June 11, 1986), Hamilton App. No. C–860103, 1986 WL 6514.

{¶ 27} In *Greene Cty.*, the Greene County Guidance Center argued that the mental health board's termination and nonrenewal of its contract violated R.C. 121.22. 19 Ohio App.3d at 4, 19 OBR 46, 482 N.E.2d 982. The Second District Court of Appeals disagreed. Although the board had discussed the subject of renewing or not renewing the contract in an executive meeting, the court concluded that the evidence failed to support the guidance center's claim that these conversations constituted deliberations that resulted in the public action.

Id. at 4–5, 19 OBR 46, 482 N.E.2d 982. The court noted that "the subject of the discussion was ongoing for at least a couple of years." Id. at 4, 19 OBR 46, 482 N.E.2d 982. Moreover, the court noted that the subject matter became an issue of public concern and was one of general public discussion. Id. at 5, 19 OBR 46, 482 N.E.2d 982. The court stated: "Under these circumstances, the mere statement that the subject of renewing or not renewing the contract with the [guidance center] was discussed at an executive session falls short of the second test in the 'Sunshine Law' that the public action be deliberated to the extent that it was the cause of the public resolution." Id.

{¶ 28} In *Theile*, a resident of Colerain Township argued that the board of township trustees violated R.C. 121.22 by (1) adopting a resolution dissolving the police department and (2) adopting a resolution rehiring four of the former police officers. After reviewing the evidence, the First District Court of Appeals rejected the appellant's argument. The evidence showed that the elimination of the police department had been an ongoing topic of discussion by the board for two years. It also showed that at one of the board's regular meetings, the trustees listened to the citizens' views on the matter for over an hour. Concluding that the board did not violate R.C. 121.22, the court stated:

> We are cognizant of the fact that public opinion entered into the trustees' final decision. A public hearing on the controversial issue was held on January 14, 1986 and a large number of citizens were present who voiced their opinions on the matter. Both Harris and Wolterman indicated that they considered the public's opinion before reaching their decision. At the January 28, 1986 open meeting, the trustees reconsidered their decision to abolish the district by passing a resolution which rehired four policemen. This decision was due, in large part, to public dissatisfaction over the trustees' earlier action. Thus, it appears the decision was not the result of private deliberations on the part of the trustees.

*Theile*, supra.

{¶ 29} The present case is somewhat distinguishable from both *Greene Cty.* and *Theile*. In *Greene Cty.*, the issue was the subject of ongoing discussion for years before the official action. It was important that there was no evidence of the nature and extent of the discussions in executive session—just the mere statement that the subject "was discussed." While there was a tape of the executive session, no one produced it, so the appellate court affirmed the trial court's finding that the plaintiffs had failed to prove the claim that the official action resulted from nonpublic deliberations. Likewise, *Theile* resulted in an affirmance of the trial court's rejection of that claim on the basis that the outside discussions were merely information-gathering. The court characterized the exchanges as general and informal discussions that did not amount to formal

decision making. Here, the evidence indicates that the proposed school district had only been a subject of discussion for a couple of months when ESC adopted the resolution proposing the creation of the new school district.[2] Moreover, ESC received important financial information about the issue in a private meeting immediately preceding its vote on the issue. And from the record it appears that ESC conducted very little, if any, public discussion about this information before voting on the issue. Thus, the trial court had some basis for believing Hansgen's contention that the private discussions went beyond mere information-gathering and resulted in decision-making. Given the significance that the board itself attributed to the financial data, the trial court's conclusion that deliberations occurred in private is not unreasonable.

{¶ 30} The Sunshine Law is designed to prevent elected officials from "meeting secretly to deliberate on public issues without accountability to the public." *State ex rel. Cincinnati Post v. Cincinnati* (1996), 76 Ohio St.3d 540, 668 N.E.2d 903. As the Supreme Court of Ohio recognized: "One of the strengths of American government is the right of the public to know and understand the actions of their elected representatives. This includes not merely the right to know a government body's final decision on a matter, but the ways and means by which those decisions were reached." *White v. Clinton Cty. Bd. of Commrs.* (1996), 76 Ohio St.3d 416, 419, 667 N.E.2d 1223. Here, after hearing the evidence, the trial court concluded that the ways and means by which ESC reached its decision were not laid before the public. Rather, the court concluded that the evidence indicated that ESC reached its decision as a result of what occurred in executive session. The trial court was entitled to rely on the fact that the result of the straw vote taken at the end of the executive session, which Hansgen testified was six to one, mirrors the board's official vote on the proposal.

{¶ 31} There is some evidence in the record to support the court's conclusion that the resolution proposing the creation of the school district resulted from deliberations in the executive session. Specifically, we conclude that (1) the absence of public discussion about the proposal on the part of ESC, (2) Hansgen's testimony that the board discussed the proposal in the executive session preceding the vote, (3) the fact that most of the board members did not receive the financial information until the executive session, and (4) the board members' testimony that they based their decision on the financial information all provide

2. In their brief, the Peebles Board of Education argues that the issue was a matter of public debate "for approximately 18 months." However, we are not concerned with the resolution creating the new school district. Rather, we are concerned with the resolution *proposing* the creation of the new school district. The record indicates that at the time ESC adopted the resolution proposing the creation of the new school district, the matter had been in the public eye for only a couple of months.

some support for the trial court's conclusion. Because there is competent, credible evidence to support the trial court's findings, we must defer to the trial court and respect its conclusion that the resolution proposing the creation of the new school district and any subsequent resolutions pertaining to the school district are invalid. Accordingly, we overrule the board's first two assignments of error.

{¶ 32} In its remaining assignments of error, the Peebles Board of Education contends that the trial court erred in concluding that the resolution creating the school district is invalid because ESC failed to comply with R.C. 3311.26. Having already determined that the resolutions relating to the new school district are invalid because of the Sunshine Law violation, we need not decide whether ESC complied with R.C. 3311.26 when it adopted the resolutions. Accordingly, we affirm the trial court's judgment.

Judgment affirmed.

KLINE and MCFARLAND, JJ., concur.