BOARD OF TRUSTEES OF THE TOBACCO USE PREVENTION
AND CONTROL FOUNDATION et al., Appellees; American
Legacy Foundation, Appellee and Cross–Appellant,

v.

BOYCE, Treasurer, Appellees; State of Ohio et al., Appellants
and Cross–Appellees; Miller et al., Appellees; American
Legacy Foundation, Appellee and Cross–Appellant.

[Cite as *Tobacco Use Prevention & Control Found. Bd. of Trustees
v. Boyce,* 185 Ohio App.3d 707, 2009-Ohio-6993.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 09AP–768, 09AP–769, 09AP–785, 09AP–786, 09AP–832 and 09AP–833.

Decided Dec. 31, 2009.

710

Steven McGann, for appellee Board of Trustees of the Tobacco Use Prevention and Control Foundation.

Zeiger, Tigges & Little, L.L.P., John W. Zeiger, and Stuart G. Parsell, for appellees Robert G. Miller Jr. and David W. Weinmann and cross-appellant American Legacy Foundation.

Damian Sikora and Aaron Epstein, for appellee Treasurer Kevin Boyce.

Richard Cordray, Attorney General, Alexandra T. Schimmer, Richard N. Coglianese, and Craig A. Calcaterra, for appellants and cross-appellees state of Ohio and Ohio Attorney General.

Katherine J. Bockbrader, for appellants and cross-appellees Ohio Department of Health and Director of Health Alvin D. Jackson.

Susan E. Ashbrook, for amici curiae Ohio General Assembly and Governor Ted Strickland.

Bricker & Eckler, L.L.P., Anne Marie Sferra, and Daniel C. Gibson, for amici curiae Ohio Dental Association, Ohio Optometric Association, Ohio State Chiropractic Association, and Ohio Association of Community Health Centers.

MacMurray, Peterson & Shuster and Helen MacMurray, for amici curiae former attorney general Betty D. Montgomery, former Ohio Senate president Richard H. Finan, and former director of health Dr. J. Nick Baird.

Peck, Shaffer & Williams, L.L.P., Thomas A. Luebbers, and Erin A. Sutton, for amici curiae County Commissioners Association of Ohio, Ohio Job and Family Service Directors Association, Public Children Services Association of Ohio, and Ohio Child Support Enforcement Agency Directors Association.

Law Offices of Russell A. Kelm and Russell A. Kelm; and Dewey and LeBoeuf, L.L.P., Harvey Kurzweil, Matthew L. DiRisio, and Joseph A. Murphy, for amicus curiae the Citizens' Commission to Protect the Truth.

Per Curiam.

{¶ 1} Appellants, the Ohio attorney general, the state of Ohio, and the Ohio Department of Health ("ODH") and its director, appeal from the August 11, 2009 judgment of the Franklin County Court of Common Pleas granting declaratory

and injunctive relief to appellees Robert G. Miller Jr. and David W. Weinmann, on their claim that 2008 H.B. No. 544 is unconstitutional because it violates the Contract Clauses of Section 10, Article I of the United States Constitution and Section 28, Article II of the Ohio Constitution, as well as the Retroactivity Clause of Section 28, Article II of the Ohio Constitution. In addition, cross-appellant American Legacy Foundation ("Legacy") has filed a conditional cross-appeal from the August 11, 2009 judgment denying it declaratory and injunctive relief on its claim that H.B. 544 substantially impaired its contract rights in violation of the Contract Clauses of the United States and Ohio Constitutions. For the following reasons, we reverse the portion of the trial court's judgment granting declaratory and injunctive relief to appellees and affirm the portion of the trial court's judgment denying declaratory and injunctive relief to Legacy.

{¶ 2} On November 23, 1998, the attorneys general of 46 states, including Ohio, entered into the Master Settlement Agreement ("MSA") with four leading American manufacturers of tobacco products. The MSA resolved litigation that the attorneys general had brought against the tobacco companies to recover state health-care expenses incurred as a result of tobacco-related illnesses. Under the MSA, Ohio is to receive approximately $10.1 billion in payments through 2025 and additional future settlement payments in perpetuity. The MSA does not limit the purposes for which Ohio may use the funds it receives.

{¶ 3} In 2000, the 123d General Assembly passed Am.Sub.S.B. No. 192, 148 Ohio Laws, Part V, 10767, which distributed MSA money to eight different funds. Most of Am.Sub.S.B. 192 was codified as R.C. Chapter 183. Pursuant to former R.C. 183.02, MSA funds were initially to be deposited into the state treasury to the credit of the newly created Tobacco Master Settlement Agreement Fund. Thereafter, the money was distributed to the eight funds set forth in former R.C. 183.02, including the Tobacco Use Prevention and Cessation Trust Fund, which was created in the state treasury pursuant to former R.C. 183.03. Former R.C. 183.04 created the Tobacco Use Prevention and Control Foundation ("foundation"), the general management of which was vested in a 20–member board of trustees. Former R.C. 183.07 directed the foundation to prepare a plan to reduce tobacco use by Ohioans, with particular focus on select populations, and empowered the foundation to implement its plan by carrying out, or providing funding for private or public agencies to carry out, programs and research related to prevention and cessation of tobacco use. Former R.C. 183.08 created the Tobacco Use Prevention and Control Endowment Fund ("endowment fund"), which, pursuant to former R.C. 183.08, "shall be in the custody of the treasurer of state but shall not be a part of the state treasury." The endowment fund was to consist of amounts appropriated from the Tobacco Use Prevention and Cessation Trust Fund, as well as investment earnings and grants and donations made to the

foundation, for use by the foundation in carrying out its duties. Former R.C. 183.08 also established the foundation as the trustee of the endowment fund and directed that disbursements from the endowment fund were to be paid by the treasurer of state only upon instruments authorized by the board.

{¶ 4} The foundation was created as a self-sustaining entity and, upon its creation, was informed by the General Assembly that it "should not expect to receive funding from the state beyond the amounts appropriated to it from the tobacco use prevention and cessation trust fund." Former R.C. 183.08. Former R.C. 183.33 prohibited the appropriation or transfer of money from the General Revenue Fund to the Tobacco Master Settlement Agreement Fund, the Tobacco Use Prevention and Cessation Trust Fund, or the endowment fund, and also prohibited any other appropriation or transfer of money from the General Revenue Fund for use by the foundation.

{¶ 5} Uncodified Section 3 of Am.Sub.S.B. 192 stated that "[e]xcept as otherwise provided, all items in this act are hereby appropriated as designated out of any moneys in the state treasury to the credit of the designated fund, which are not otherwise appropriated." 148 Ohio Laws, Part V, 10797. To fund the antitobacco efforts, Section 6 appropriated nearly $235 million of the MSA proceeds to the Tobacco Use Prevention and Cessation Trust Fund—a fund of ODH and one of the eight funds created by Am.Sub.S.B. 192 "in the state treasury." Section 6 further directed the director of health to disburse those funds outside the state treasury into the endowment fund to be used by the foundation to carry out its duties. Id. at 10798.

{¶ 6} As time passed, Ohio's economic landscape began to deteriorate. In response, on April 2, 2008, the governor and leaders of the 127th General Assembly announced a $1.57 billion jobs stimulus package. The announcement included the stated intent to reallocate approximately $230 million from the foundation's approximately $270 million endowment fund to the jobs stimulus package.

{¶ 7} Following this announcement, the board, at its regularly scheduled April 4, 2008 meeting, adopted a resolution authorizing the transfer of $190 million from the endowment fund to Legacy, a nonprofit corporation focusing on the prevention, control, and cessation of tobacco use. On April 8, 2008, Michael Renner, the foundation's executive director, pursuant to the authority granted him by the April 4, 2008 resolution, executed a contract with Legacy on behalf of the foundation. On the same day, Renner submitted a written request to the state treasurer to liquidate $190 million from the endowment fund and transfer it to Legacy.

{¶ 8} Also on April 8, 2008, the 127th General Assembly passed Am.S.B. No. 192. Uncodified Section 3 of Am.S.B. 192 directed the state treasurer to liquidate

the endowment fund, reserving the first $40 million in proceeds from the liquidation for use by the foundation for the sole purpose of paying contractual or other legally binding obligations incurred by the foundation on or before the effective date of the act. Section 3 further directed the state treasurer to deposit the remaining proceeds from the liquidation into the state treasury to the credit of the newly created jobs fund. Section 4 declared the act an emergency measure necessary to, among other things, "minimize the impact of current economic stresses by using state funds in a prudent manner to increase employment and job security."

{¶ 9} On April 9, 2008, the foundation filed a verified complaint for declaratory relief, which included a request for a preliminary and permanent injunction, against the Ohio treasurer of state. The foundation sought a declaration that 2008 Am.S.B. 192 was unconstitutional and sought to enjoin the state treasurer from transferring the money in the endowment fund to the jobs fund. The foundation also sought a temporary restraining order, which the trial court denied on April 10, 2008. Also on April 10, 2008, the trial court granted a motion filed by the state of Ohio and the Ohio attorney general to intervene as defendants in the action.

{¶ 10} On April 15, 2008, the board met and voted to rescind the portion of its April 8, 2008 resolution authorizing the transfer of $190 million from the endowment fund to Legacy. The next day, April 16, 2008, Renner notified the state treasurer in writing that the board was withdrawing its April 8, 2008 request to transfer $190 million to Legacy.

{¶ 11} On April 21, 2008, Legacy moved to intervene as a plaintiff in the foundation's action and filed a verified complaint seeking a declaration that it had a binding contract with the foundation requiring the transfer of $190 million of the endowment fund to it and that the provisions of 2008 Am.S.B. 192 mandating transfer of the same money to the jobs fund was an unconstitutional impairment of its contract rights in violation of Section 10, Article I of the United States Constitution and Section 28, Article II of the Ohio Constitution. The trial court granted Legacy's motion to intervene on April 21, 2008.

{¶ 12} On April 28, 2008, the state of Ohio and the Ohio attorney general filed an answer and counterclaim to Legacy's complaint. The counterclaim asserted that (1) the board's action authorizing the contract between the foundation and Legacy was invalid because it was made in violation of Ohio's Open Meetings Act, (2) the board had unlawfully delegated its statutory authority, (3) the board had breached its fiduciary duty to manage the endowment fund by unlawfully adopting the resolution authorizing the contract between the foundation and Legacy, (4) the contract between the foundation and Legacy was unenforceable for want of consideration, and (5) execution of the contract between the founda-

tion and Legacy violated the legislative and executive intent as to the public policy of the state of Ohio.

{¶ 13} On May 6, 2008, the General Assembly passed H.B. No. 544, an emergency measure that became effective immediately. Section 1 of H.B. 544 enacted R.C. 3701.84, which in effect transferred certain powers of the foundation to ODH. Specifically, R.C. 3701.84 permits ODH to prepare and execute a plan to reduce tobacco use by Ohioans and, pursuant to that plan, permits ODH to "carry out, or provide funding for private or public agencies to carry out, research and programs related to tobacco use prevention and cessation." Section 1 also enacted R.C. 3701.841, which created in the state treasury the "tobacco use prevention fund," consisting of money deposited by the state treasurer into the fund from the liquidation of the endowment fund and gifts, grants, or donations received by the ODH director for purposes of the fund, as well as investment earnings of the fund. Sections 2 and 8 repealed R.C. 183.03 through 183.09 and Section 3 of 2008 Am.S.B.192, respectively. Section 3 abolished the foundation and declared that "[n]o validation, cure, right, privilege, remedy, obligation, or liability is lost or impaired by reason of the abolition of the foundation" and that "any such matter shall be administered by [ODH]." Section 3 further declared that all the foundation's rights, privileges, and obligations were to be administered by ODH and that any actions or proceedings involving the foundation pending on the effective date of the act were to be prosecuted or defended in the name of ODH or its director. Section 4 directed the state treasurer to liquidate the endowment fund and deposit the first $40 million in proceeds from the liquidation into the state treasury to the credit of the newly created Tobacco Use Prevention Fund. Section 4 further directed the state treasurer to deposit the remaining proceeds from the liquidation (approximately $230 million) into the state treasury to the credit of the newly created jobs fund.

{¶ 14} On May 9, 2008, Legacy amended its complaint to add ODH and its director as defendants, citing the provisions of H.B. 544 that made ODH the foundation's successor. Legacy applied its constitutional impairment-of-contract argument to the provisions of H.B. 544.

{¶ 15} On May 27, 2008, Robert G. Miller Jr. and David W. Weinmann ("appellees") filed a verified complaint for declaratory relief, which included a request for a preliminary and permanent injunction, against the state of Ohio, the attorney general, and the treasurer of state. Appellees, former smokers, claimed that through the enactment of R.C. Chapter 183, specifically former R.C. 183.07 and 183.08, and by transferring money into the endowment fund outside the state treasury, the General Assembly had created and funded a trust without reserving the right to revoke it. Appellees claimed that as participants in smoking-cessation programs funded by the foundation, they were third-party beneficiaries

of the trust and that by reallocating endowment fund money to the jobs fund via H.B. 544, appellants were improperly attempting to revoke the trust. Accordingly, appellees requested that the court enter judgment declaring (1) that H.B. 544 is unconstitutional as violating the Contract Clauses of Section 10, Article I of the United States Constitution and Section 28, Article II of the Ohio Constitution and the General Assembly's appropriations limitations under the Ohio Constitution, and (2) that H.B. 544 illegally attempts to misappropriate nontreasury funds and unlawfully breach an irrevocable trust. Appellees also requested that the court enjoin the state treasurer from transferring the money in the endowment fund to the jobs fund.

{¶ 16} Upon appellees' motion, the trial court consolidated their action with that of the foundation. The trial court ordered a freeze of the money at issue until it ruled on the motions for preliminary injunction.

{¶ 17} The trial court held a preliminary-injunction hearing on June 2 through June 4, 2008. On October 3, 2008, the court requested that the parties provide additional briefing on the issue whether the endowment fund constituted an irrevocable trust. The parties submitted additional briefing on the issue on October 31, 2008.

{¶ 18} On February 10, 2009, the trial court issued an order denying Legacy's motion for preliminary injunction, concluding that it had failed to demonstrate that it was likely to prevail on the merits of its constitutional impairment-of-contract claim. The court found specifically that H.B. 544 did not substantially impair Legacy's rights under the contract with the foundation, because that contract was invalid. In so concluding, the court found that (1) the board's action authorizing the contract was invalid because it was made in violation of Ohio's Open Meetings Act, (2) the board's attempts to delegate its statutory authority were unlawful, (3) the contract had never been approved or ratified by the board as required by Ohio law; and (4) the contract did not meet state requirements for a grant agreement under R.C. 9.231.

{¶ 19} The trial court granted appellees' motion for a preliminary injunction, concluding that they had a substantial likelihood of success on the merits of their claim. The court first concluded that appellees had standing to prosecute the action, because each had a personal stake in the existing controversy and possessed a special right and interest in the money constituting the endowment fund, separate and distinct from those of the general public, to ensure that the funds continued to be used for control, prevention, and cessation of tobacco use in Ohio. The court further concluded that through the enactment of R.C. Chapter 183, specifically former R.C. 183.07 and 183.08, and by transferring money into the endowment fund outside the state treasury, the General Assembly plainly evinced the intent to create a trust. The court found that the statutory scheme

creating the endowment fund had all the elements of a trust: a trustee (the foundation), a trust corpus (the endowment fund), and trust beneficiaries (Ohio's youth and tobacco users). The court further found that the trust was irrevocable because the General Assembly had failed to reserve the right to revoke the trust upon creating and funding it. The court also found that H.B. 544 unconstitutionally impaired the obligations of the trust and the vested rights of the trust beneficiaries, including appellees, through its attempt to divert money from the endowment fund to the jobs fund. In addition, the court found that H.B. 544's impairment of the trust was not reasonable and necessary to serve important state purposes, because the state could employ equally effective alternative means of funding the jobs stimulus proposal.

{¶ 20} On March 3, 2009, appellees amended their complaint to add ODH and its director as defendants and to assert an additional claim that H.B. 544 violated the Retroactivity Clause of Section 28, Article II of the Ohio Constitution.

{¶ 21} Following a June 1, 2009 trial on the merits, the trial court issued a decision on August 11, 2009, incorporating the findings of fact and conclusions of law contained in the order granting the preliminary injunction. The court entered judgment against Legacy on its claims, finding that the contract between it and the foundation was invalid and unenforceable. The court also entered judgment for appellees on their claims, finding as follows:

> The General Assembly and the State plainly intended to create the Endowment Fund (the "Trust") as an irrevocable trust by enacting R.C. 183.07 and 183.08 without reserving any right to revoke the Trust; by expressly establishing the Endowment Fund outside the state treasury; by expressly designating the Ohio Tobacco Use Prevention and Control Foundation (the "Foundation") as "trustee" of the Endowment Fund; by providing the Foundation with fiduciary responsibilities and control over the Fund; by specifying by statute the intended beneficiaries of the Trust (Ohio's youth and tobacco users); and by making completed, unconditional transfers of monies into the Endowment Fund (subsequent to, and as distinguished from, the General Assembly's prior appropriations to ODH for tobacco cessation purposes).

{¶ 22} Having so found, the court concluded that those portions of H.B. 544 that purported to transfer the money from the endowment fund or revoke the trust violated the Retroactivity Clause of the Ohio Constitution and the Contract Clauses of the United States and Ohio Constitutions. Accordingly, the court permanently enjoined the state of Ohio, the treasurer of state, the attorney general, and ODH and its director from enforcing any provision of H.B. 544 related to the endowment fund. The court further ordered that all money in the endowment fund was to remain in the custody of the state treasurer and not be a part of the state treasury and that the money was not to be subject to control,

appropriation, or expropriation, by the General Assembly. In addition, the court retained continuing jurisdiction to enforce its order, protect the trust, and oversee its administration.

{¶ 23} This court subsequently granted appellants' motion to stay its judgment and granted appellees' motion for an injunction pending appeal. On appeal, appellants advance the following four assignments of error:

[1]. The trial court erred in finding that the General Assembly created an irrevocable charitable trust when it created the endowment fund under the supervision of the Ohio Tobacco Use Prevention and Control Foundation.

[2]. The trial court erred in ruling that Appellees have standing to challenge the General Assembly's enactment of H.B. 544.

[3]. The trial court erred in ruling that H.B. 544 violates Article II, § 28 of the Ohio Constitution and Article I, § 10 of the United States Constitution.

[4]. The trial court erred in ruling that H.B. 544 violated the Retroactivity Clause of the Ohio Constitution.

{¶ 24} Legacy has filed a conditional cross-assignment of error, as follows:

The trial court committed reversible error by holding that the contract between American Legacy Foundation (Legacy) and the Ohio Tobacco Use Prevention and Control Foundation is not enforceable and, thus, ruling against Legacy on its claim that H.B. 544 violates the Contracts Clauses of the Ohio and United States Constitutions.

{¶ 25} In addition, the Ohio General Assembly, together with Governor Ted Strickland; the County Commissioners Association of Ohio, together with the Ohio Job and Family Service Directors Association, the Public Children Services Association of Ohio, and the Ohio Child Support Enforcement Agency Directors Association; and the Ohio Dental Association, together with the Ohio Optometric Association, the Ohio State Chiropractic Association, and the Ohio Association of Community Health Centers, have filed amicus briefs in support of appellants. Former Ohio attorney general Betty D. Montgomery, together with former Ohio Senate president Richard H. Finan and former director of health J. Nick Baird, M.D.; and The Citizens' Commission to Protect the Truth, have filed amicus briefs in support of appellees and cross-appellant.

{¶ 26} As appellants' four assignments of error are interrelated, we will address them together. Appellants contend that the trial court improperly concluded that the endowment fund constituted an irrevocable charitable trust created under R.C. Chapter 183, that appellees had standing to challenge the enactment of H.B. 544, and that H.B. 544 unconstitutionally impaired the obligations of the trust and the vested rights of the trust beneficiaries, including

appellees, through its attempt to divert money from the endowment fund to the jobs fund.

{¶ 27} The interpretation of the constitutionality of a legislative enactment presents a question of law. *Andreyko v. Cincinnati*, 153 Ohio App.3d 108, 2003-Ohio-2759, 791 N.E.2d 1025. "Questions of law are reviewed de novo, independently, and without deference to the trial court's decision." Id.

{¶ 28} The Supreme Court of Ohio has repeatedly held that legislative enactments are entitled to a strong presumption of constitutionality. *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20, citing *N. Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 377, 15 O.O.3d 450, 402 N.E.2d 519. "When the validity of a statute is challenged on constitutional grounds, the sole function of the court is to determine whether it transcends the limits of legislative power," not to judge the "policy or wisdom" of the statute. *Ohio Congress* at ¶ 20, quoting *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.* (1942), 139 Ohio St. 427, 438, 22 O.O. 494, 40 N.E.2d 913. Accordingly, a party challenging the constitutionality of a legislative enactment bears the burden of proving that it is unconstitutional beyond a reasonable doubt. *Austintown Twp. Bd. of Trustees v. Tracy* (1996), 76 Ohio St.3d 353, 356, 667 N.E.2d 1174; *Ohio Congress* at ¶ 20 (a legislative enactment "should not be declared unconstitutional 'unless it appears beyond a reasonable doubt that the legislation and constitutional provision are clearly incompatible'"). In reviewing constitutional claims, the court "must give due deference to the General Assembly," *Ohio Congress* at ¶ 20, and "apply all presumptions and pertinent rules of construction so as to uphold, if at all possible, a statute or ordinance assailed as unconstitutional," *State v. Dorso* (1983) 4 Ohio St.3d 60, 61, 4 OBR 150, 446 N.E.2d 449.

{¶ 29} Neither appellants nor appellees dispute that when H.B. 544 was enacted, the endowment fund resided in a custodial account, that is, a fund in the custody of the state treasurer but not part of the state treasury. Indeed, former R.C. 183.08 expressly stated as much—the endowment fund "shall be in the custody of the treasurer of state but shall not be a part of the state treasury." Appellees contend that the General Assembly's creation of the endowment fund as a custodial account expressly outside the state treasury manifested its intention that the endowment fund constitute an irrevocable trust permanently beyond its control. Appellants challenge appellees' contention that a custodial account outside the state treasury is inherently an irrevocable fund.

{¶ 30} As appellants submit, the legal nature of a custodial account is best understood in the context of the state funding process more broadly and in comparison to appropriated funds that reside within the state treasury. State

programs are generally funded through biennial appropriations. At the beginning of each biennium, the General Assembly appropriates a specific amount of money from the state treasury for a specific purpose. This is the process contemplated by Section 22, Article II of the Ohio Constitution. First, "money shall be drawn from the treasury" only upon "a specific appropriation, made by law." Second, "no appropriation shall be made for a longer period than two years."

{¶ 31} Consistent with those provisions, the General Assembly requires state agencies to expend "appropriations made to a specific fiscal year" on "liabilities incurred within that fiscal year." R.C. 131.33. At the end of the fiscal year, unspent money automatically "revert[s] to the funds from which the appropriations were made," id., usually the General Revenue Fund. In other words, for appropriated funds residing within the state treasury, any unspent agency funds remaining at the end of any fiscal year automatically revert to the General Revenue Fund for the General Assembly to reallocate pursuant to that year's budgetary needs.

{¶ 32} In certain situations, however, the General Assembly prescribes a different funding mechanism that is not subject to those rules. Pursuant to R.C. 113.05, the General Assembly may create a custodial account—an account that is maintained by the state treasurer but is not part of the state treasury for purposes of the appropriation process under Section 22, Article II of the Ohio Constitution. The custodial account is removed from the biennial appropriation cycle so that unspent funds do not revert automatically to the General Revenue Fund at the end of the biennium but, rather, remain in the custodial account.

{¶ 33} The choice of how to fund a specific state program—through regular biennial appropriations or the creation of a custodial account—is left to the General Assembly's discretion. But the fact that the General Assembly chooses the latter path does not mean that funds placed in a custodial account are shielded in perpetuity from future legislation. Only in a narrow sense are custodial accounts protected from "reappropriations"—that is, they are not automatically reappropriated at the end of every biennium pursuant to the biennial appropriation process set forth in Section 22, Article II of the Ohio Constitution and R.C. 131.33. This does not mean that custodial funds are shielded in perpetuity from the General Assembly's plenary power to determine where state money is needed and to reallocate public funds as it sees fit.

{¶ 34} Although appellees bear the burden of proof in this case, they offer no authority supporting the proposition that custodial funds, once created, cannot be abolished, amended, or transferred by the General Assembly. To the contrary, the Ohio Constitution provides that the General Assembly's legislative power is plenary—it can pass any law so long as the legislation is not constitu-

tionally prohibited. See Section 1, Article II of the Ohio Constitution; *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 162, 38 O.O.2d 404, 224 N.E.2d 906 (the constitutional grant of authority at Section 1, Article II vests in the General Assembly the plenary power to enact any law except those that conflict with the Ohio or United States Constitutions). As the Supreme Court of Ohio has long recognized, this constitutional provision guarantees that the General Assembly's legislative power "will generally be deemed ample to authorize the enactment of a law," presumably including a law dissolving, amending, or liquidating a custodial account, "unless the legislative discretion has been qualified or restricted by the constitution in reference to the subject-matter in question. If the constitutionality of the law is involved in doubt, that doubt must be resolved in favor of the legislative power. The power to legislate for all the requirements of civil government is the rule, while a restriction upon the exercise of that power in a particular case is the exception." *State ex rel. Poe v. Jones* (1894), 51 Ohio St. 492, 504, 37 N.E. 945.

{¶ 35} Thus, the General Assembly retains its power to legislate with respect to custodial funds, like the endowment fund, unless the funds have expressly been rendered unreachable through a constitutional amendment. Thus, the only way to have limited the power of the General Assembly to reallocate the tobacco settlement money would have been to amend the Ohio Constitution to restrict the use of the funds and to make the endowment fund undissolvable. States desiring to permanently restrict the use of their tobacco settlement money have done so expressly through constitutional amendments. See, e.g., Fla. Const., Article X, Section 27; Idaho Const., Article VII, Section 18; Mont. Const., Article XII, Section 4. Ohio has never promulgated a constitutional amendment restricting the use of its tobacco settlement funds. Accordingly, the General Assembly retained its power to legislate with regard to those funds. Indeed, under R.C. 183.32 prior to its repeal by 2007 Am.Sub.H.B. 119, the General Assembly provided for a legislative committee to periodically reexamine the use of the MSA funds and to recommend changes to reflect the state's priorities. The securitization of the MSA funds illustrates the General Assembly's continuing authority to expend that money as it deems fit.

{¶ 36} As previously noted, the sole basis for appellees' constitutional claims is the contention that the endowment fund was an irrevocable charitable trust that conferred upon appellees, as former smokers, permanently vested rights in the endowment fund and its programs. We disagree.

{¶ 37} Appellees urge this court to graft the law of private charitable trusts onto public funds. Specifically, appellees contend that the General Assembly manifested its intention to establish the endowment fund as a trust by expressly designating the foundation as trustee of the endowment fund and by imposing

mandatory fiduciary duties upon the foundation as trustee. Appellees argue that the only way the General Assembly could have terminated the endowment fund was to have enacted a right to revoke the trust when it was created or before it was funded. To be sure, Ohio follows the prevailing view that a private trust, once created, may not be revoked unless the settlor has expressly reserved the power to revoke the trust. However, this principle does not apply in these circumstances.

{¶ 38} The Ohio Constitution prohibits one General Assembly from binding a subsequent one as to any fiscal or other matter: "It is sound law that one General Assembly cannot make a binding promise that the next General Assembly will not change the law." *State ex rel. Foreman v. Brown* (1967), 10 Ohio St.2d 139, 158–159, 39 O.O.2d 149, 226 N.E.2d 116 (Schneider, J., concurring). See also *State ex rel. Youngstown v. Jones* (1939), 136 Ohio St. 130, 136, 16 O.O. 73, 24 N.E.2d 442 (a legislature has no power to bind successive legislatures). That principle is a constitutional one, derived from the General Assembly's plenary power to legislate as to any matter, except as limited by the state and federal Constitutions. See Section 1, Article II of the Ohio Constitution; *Jackman,* 9 Ohio St.2d at 162, 38 O.O.2d 404, 224 N.E.2d 906.

{¶ 39} While no Ohio court has directly addressed this issue, case law from at least one other jurisdiction confirms that a state legislature cannot create an irrevocable public trust. In *Barber v. Ritter* (Colo.2008), 196 P.3d 238, the Colorado Supreme Court considered an issue similar to the one before us here. During the economic downturn between 2001 and 2004, the Colorado General Assembly transferred more than $442 million from 31 special funds into the state's General Revenue Fund in order to balance the state budget. Several of those transfers were made from special funds designated as "trusts." The plaintiffs in that case claimed, just as appellees do here, that the General Assembly did not have the authority to transfer the funds, because they resided in "trusts" and because none of the statutes creating the trusts reserved the legislature's right to revoke or amend them.

{¶ 40} Noting that the General Assembly's power to legislate was "absolute" and "plenary," particularly with respect to public money, the Colorado Supreme Court held: "To hold that the General Assembly could limit this plenary power to appropriate by creating an irrevocable public trust would be to effectively hold that the General Assembly could abrogate its constitutional powers by statute. This is not the law." Id. at 254. In other words, the court determined that the transfers were constitutional precisely because it would have been unconstitutional, i.e., a violation of the General Assembly's plenary legislative power, to construe the public trust funds as irrevocable. The court ultimately concluded that "[t]he status of the three cash funds as public trusts does not, and

constitutionally cannot, have any limiting effect on the legislature's plenary power to amend or repeal those funds' enabling statutes." Id.

{¶ 41} We are persuaded by the sound reasoning of the Colorado Supreme Court, which directly echoes the mandates of the Ohio Constitution and the Ohio Supreme Court with regard to the General Assembly's legislative power. Because the General Assembly has plenary legislative power to revoke or transfer public funds, it acted constitutionally through H.B. 544 in transferring the money in the endowment fund to other economic priorities.

{¶ 42} Furthermore, appellees' contention that the endowment fund is similar to Ohio's public-employee retirement funds and thus enjoys the same constitutional protections as those funds is without merit. Public retirement funds consist of compulsory contributions made by specific individuals, i.e., public employees and their employers. Those contributions are then held in trust for the sole benefit of the public-employee contributors, who have a vested interest in the funds. *State ex rel. Preston v. Ferguson* (1960), 170 Ohio St. 450, 464, 11 O.O.2d 204, 166 N.E.2d 365. As Ohio courts, including this court, have long recognized, public retirement accounts are "not [to] be considered state funds in the general sense." *In re Appeal of Ford* (1982), 3 Ohio App.3d 416, 420, 3 OBR 484, 446 N.E.2d 214.

{¶ 43} In contrast, the General Assembly created the endowment fund using discretionary general revenue funds that the state received from the settlement with the tobacco companies. The funds were received by the state as general state money, subject to expenditure by the General Assembly for any purpose. The Tobacco Use Prevention and Cessation Trust Fund was likewise created by statute and designated as the recipient of some of the settlement money. The endowment fund was, in turn, created by statute and was funded by the Tobacco Use Prevention and Cessation Trust Fund. In other words, the endowment fund was created solely from state funds, not from a source that connected them intrinsically with the rights of particular persons.

{¶ 44} Moreover, public retirement funds provide a pension for specific public employees, and the board overseeing the funds owes a fiduciary duty to those specific beneficiaries. R.C. 145.11 ("The board and other fiduciaries shall discharge their duties with respect to the funds solely in the interest of the participants and beneficiaries; for the exclusive purpose of providing benefits to participants and their beneficiaries* * * "). The public-employee retirement systems do not exercise their statutory functions on behalf of the state but, rather, on behalf of specific, identifiable beneficiaries. This is wholly unlike the foundation and the endowment fund, which served a generalized public purpose and whose trustees had no fiduciary obligations to any specific, identifiable

individuals. See former R.C. 183.07 (the purpose of the foundation is to "prepare a plan to reduce tobacco use by Ohioans").

{¶ 45} In short, appellees' attempts to compare the endowment fund to the public retirement funds are unavailing. Public retirement funds are protected, but for reasons wholly inapplicable to the endowment fund. Like most of the state's custodial accounts, the endowment fund was simply a public fund subject to the General Assembly's power to abolish, amend, or transfer it as it deems fit.

{¶ 46} As noted above, the sole basis for the trial court's ruling that H.B. 544 violates the Contract Clauses of the United States and Ohio Constitutions and the Retroactivity Clause of the Ohio Constitution was its finding that the endowment fund constituted an irrevocable charitable trust that created vested rights for appellees as former smokers who participated in smoking-cessation programs funded by the foundation. Having concluded, however, that the endowment fund was not an irrevocable charitable trust, we also conclude that it created no vested rights for appellees or any other individual; accordingly, appellees' constitutional claims fail. Appellants' first, third, and fourth assignments of error are sustained.

{¶ 47} Appellants also claim that the trial court erred in concluding that appellees had standing to challenge the constitutionality of H.B. 544. Given our conclusion that appellees' claims are without merit and that there are no constraints on the General Assembly's ability to expend the funds under these circumstances, we need not address appellants' contention. Accordingly, appellants' second assignment of error is moot.

{¶ 48} Having concluded that the trial court improperly found H.B. 544 unconstitutional, we must address Legacy's cross-assignment of error. Legacy contends that the trial court erred in ruling that the contract between it and the foundation was invalid and unenforceable, rendering Legacy's constitutional impairment-of-contract claim without merit.

{¶ 49} In analyzing whether a legislative enactment violates the Contract Clauses of the United States and Ohio Constitutions, a court must initially ask " 'whether the change in state law has "operated as a substantial impairment of a contractual relationship." ' " *State ex rel. Horvath v. State Teachers Retirement Bd.* (1998), 83 Ohio St.3d 67, 76, 697 N.E.2d 644, quoting *Gen. Motors Corp. v. Romein* (1992), 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328, quoting *Allied Structural Steel Co. v. Spannaus* (1978), 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed.2d 727. This inquiry involves three components: " 'whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.' " *Horvath* at 76, 697 N.E.2d 644, quoting *Romein*, 503 U.S. at 186, 112 S.Ct. 1105, 117

L.Ed.2d 328. The "obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them." *Home Bldg. & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 431, 54 S.Ct. 231, 78 L.Ed. 413.

{¶ 50} Pursuant to the foregoing, we must first determine whether there exists a contractual relationship between Legacy and the foundation. As noted, the trial court concluded that no contractual relationship exists between the two entities as a result of the board's noncompliance with R.C. 121.22, Ohio's Open Meetings Act. The trial court further concluded that the contract between the board and Legacy is invalid because (1) the board unlawfully delegated its statutory authority, (2) Renner executed the contract without ratification by the board, and (3) the contract does not meet requirements for grant agreements.

{¶ 51} Evidence presented at the hearing on the motions for preliminary injunction establishes the following. The April 2, 2008 announcement regarding the stimulus proposal raised concerns for several board members. Indeed, one board member testified that upon hearing the announcement, he immediately believed that the stimulus proposal would precipitate an imminent legal dispute about whether the General Assembly or the foundation had authority over the endowment fund. Therefore, prior to the April 4, 2008 board meeting, that board member discussed with several other board members the nature of the foundation, its legal status, and the effect that any subsequent legislative and/or legal action might have on the board's mission and fiduciary responsibilities. Pursuant to those discussions, that board member informed Renner and several other board members that he would propose at the April 4, 2008 meeting that the board transfer money from the endowment fund to an outside entity for use in preventing and stopping tobacco use.

{¶ 52} In the meantime, on April 2, 2008, Renner left a voicemail message with Susan Walker, the assistant attorney general who represented the foundation, requesting legal advice related to the stimulus proposal. Renner testified that his voicemail message described the legal questions at issue and informed Walker that he needed her legal advice for the board's April 4, 2008 meeting. Due to concerns about the attorney general's dual representation of parties with potentially conflicting claims to the money in the endowment fund, Renner also requested that the attorney general appoint special outside legal counsel for the foundation.

{¶ 53} Walker, who was out of the state on business, did not respond to Renner's voicemail message; however, she informed Britt Strottman, another assistant attorney general, of Renner's requests and asked her to notify senior management in the attorney general's office. On April 3, 2008, Strottman left a voicemail message with Renner stating that the attorney general was in an important meeting to discuss the issues raised by Renner. Strottman requested

that Renner set forth the foundation's requests for legal advice in writing and indicated that an assistant attorney general would contact him before the board's April 4, 2008 meeting.

{¶ 54} Renner unsuccessfully attempted to return Strottman's call after office hours on April 3, 2008. Pursuant to Strottman's request, Renner prepared a letter to the attorney general, describing the issues about which the board requested advice. Due to time constraints, Renner was unable to deliver the letter to the attorney general's office that day; accordingly, he resolved to present it to an assistant attorney general at the board meeting the next day.

{¶ 55} By the time the board convened its April 4, 2008 meeting, the attorney general's office had not provided a substantive response to the legal questions posed by Renner, nor had it appointed special counsel for the board. Renner testified that although Walker had previously informed him that she could not attend the meeting due to a work conflict and that he had not expressly requested that another assistant attorney general attend in her place, he fully expected an assistant attorney general to attend the meeting, as one routinely attended board meetings, particularly when there were legal issues to discuss. However, no one from the attorney general's office attended the meeting. Although Renner and the board members expressed concern about the absence of legal counsel, no one called the attorney general's office to request that a lawyer attend the meeting. Moreover, Renner testified that the board members discussed, but rejected, a suggestion that the board convene a special meeting when an assistant attorney general could be present.

{¶ 56} The official minutes from the April 4, 2008 board meeting reflect that shortly after the meeting convened, the board chairman explained that the board needed to go into executive session to discuss legal issues related to the events surrounding the endowment fund. Following this announcement, one of the board members moved to go into executive session "to consider confidential legal matters." The motion passed by unanimous roll call vote.

{¶ 57} During the executive session, the board discussed several issues, including (1) whether the board or the General Assembly had legal authority over the endowment fund, (2) whether the endowment fund constituted a trust for the benefit of Ohio smokers, (3) whether to transfer funds from the endowment fund to an outside entity, and, if so, the amount of funds to transfer and the potential recipients of the transferred funds, (4) the alternatives for legal action against the General Assembly to protect the endowment fund, (5) the board's obligation as fiduciaries of the endowment fund, (6) the potential conflict of interest as to the attorney general and the need for independent outside counsel, (7) the likelihood of imminent litigation with the governor and General Assembly if the board

transferred endowment fund money to an outside entity, and (8) the authorization of Renner to carry out the transfer.

{¶ 58} Upon conclusion of the executive session, the board returned to the public portion of the meeting. According to the official meeting minutes, the board chairman thanked the board for the two-hour discussion that occurred in executive session. Thereafter, one of the board members moved to request the attorney general "to appoint special legal counsel to represent the Ohio Tobacco Use Prevention and Control foundation to utilize the foundation endowment dollars as intended in Ohio Revised Code 183." Discussion related to the appointment of special counsel lasted approximately ten minutes. Following a vote, the special-counsel resolution passed 13 to 1.

{¶ 59} Immediately following the special-counsel vote, another board member made the following motion: "to authorize the transfer of $190,000,000 from the Tobacco Use Prevention and Control foundation endowment fund to one or all of three organizations equally: Campaign for Tobacco Free Kids, American Legacy foundation, Ohio Hospital Association for Healthy Communities foundation, to carry out the mission of the Ohio Tobacco Prevention foundation and fulfill the board's fiduciary duties. In addition, to authorize the Executive Director, Michael Renner, to do all things necessary and prudent to carry out the transfer and to alter distribution if satisfactory contractual agreements cannot be reached with one or more of the organizations." The board adopted the transfer resolution by a vote of 10 to 4 without discussion.

{¶ 60} After the board meeting, Renner contacted all three organizations named in the resolution. Legacy was the only organization able to respond within the foundation's time frame and willing to enter into a contract in connection with the transfer.

{¶ 61} Thereafter, on April 8, 2008, Renner, pursuant to the authority granted him by the board's transfer resolution, executed a contract with Legacy on behalf of the foundation, whereby, in return for the foundation's transfer of $190 million from the endowment fund to Legacy, Legacy committed to use those funds in connection with smoking-cessation and smoking-prevention programs. Renner testified that prior to executing the contract, an assistant attorney general reviewed and "signed off" on the contract.

{¶ 62} Under the terms of the contract, Legacy agreed to (1) focus use of the funds upon Ohio populations, (2) prepare a plan, consistent with that of the foundation, to reduce tobacco use by Ohioans, targeting particular groups, and (3) carry out, or provide funding for private or public agencies to carry out, research and programs related to prevention and cessation of tobacco use and, to that end, establish an objective process to determine what research and program proposals to fund. After executing the contract, Renner delivered a letter on behalf of the

foundation to the state treasurer, requesting that the treasurer disburse and transfer $190 million of the endowment fund to Legacy.

{¶ 63} Legacy contends that the trial court erroneously concluded that the contract between it and the foundation is invalid and unenforceable as a result of the board's noncompliance with R.C. 121.22, Ohio's Open Meetings Act. More particularly, Legacy challenges the trial court's findings that the board violated R.C. 121.22 by failing to state a proper legal basis under R.C. 121.22(G) to convene in executive session and by deliberating in executive session upon matters that it was required to discuss in open session.

{¶ 64} Ohio's Open Meetings Act "is to be liberally construed to require a public body at all times to take official action and conduct deliberations upon official business in meetings open to the public. R.C. 121.22(A). Its purpose is to assure accountability of elected officials by prohibiting their secret deliberations on public issues." *State ex rel. Cincinnati Enquirer v. Hamilton Cty. Commrs.* (Apr. 26, 2002), 1st Dist. No. C–010605, 2002 WL 727023, citing *State ex rel. Cincinnati Post v. Cincinnati* (1996), 76 Ohio St.3d 540, 544, 668 N.E.2d 903. If specific procedures are followed, public officials may discuss certain sensitive information in a private executive session from which the public is excluded. R.C. 121.22(G) lists the seven matters that a public body may consider in executive session. A public body may convene in executive session only after a motion and a vote that specifically identify the permissible topic. R.C. 121.22(G); *State ex rel. Long v. Council of the Village of Cardington* (2001), 92 Ohio St.3d 54, 59, 748 N.E.2d 58 (if a public body decides to conduct an executive session, the public body must specify in its motion those matters that it will discuss in the executive session). The executive session may then be held "for the sole purpose of the consideration of" one of the enumerated exceptions. R.C. 121.22(G).

{¶ 65} Legacy contends that the motion to enter executive session stated a proper basis under R.C. 121.22(G)(3), which permits executive session for the purpose of conducting "conferences with an attorney for the public body concerning disputes involving the public body that are the subject of pending or imminent court action." But the motion does not mention conferring with legal counsel for the board. Further, pursuant to R.C. 109.02, the attorney general is legal counsel for all state agencies, including the board. Legacy concedes that no assistant attorney general attended the April 4, 2008 board meeting. Legacy contends, however, that Renner, a licensed attorney and the board's executive director, attended the meeting and provided legal counsel to the board; accordingly, Legacy argues, Renner acted as the "attorney for the public body," and, thus, the R.C. 121.22(G)(3) exception applies. We disagree.

{¶ 66} Several board members testified that in the absence of an assistant attorney general, the board questioned Renner and three of the board members, all of whom are licensed attorneys in Ohio, about the legal matters at issue and that the four attorneys responded to the board's questions using their legal training and expertise. However, Renner, as well as several board members, testified that all four attorneys expressly stated that their responses were not made in any official capacity as the board's attorneys. In addition, several board members testified that they did not believe that Renner or the three attorney board members acted as legal counsel for the foundation. The four attorneys, including Renner, testified that they did not consider themselves to be attorneys for the board.

{¶ 67} Ohio law establishes that board members or employees who happen to be attorneys are not the "attorney for the public body" contemplated by R.C. 121.22(G)(3). *Awadalla v. Robinson Mem. Hosp.* (June 5, 1992), 11th Dist. No. 91–P–2385, 1992 WL 188333 (meeting minutes reflect that attorney board member Stephen Colechhi was designated as senior vice president; accordingly, the evidence did not support an argument that he served as the hospital's attorney); *In re Smith* (May 15, 1991), 5th Dist. No. CA–90–11, 1991 WL 87166 (R.C. 121.22(G)(3) did not apply, because the county prosecutor, who was the attorney for the public body, was not present at the meeting).

{¶ 68} Legacy contends that *Awadalla* was superseded by the Ohio Supreme Court's decision in *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, 824 N.E.2d 990. Legacy's contention is without merit because *Leslie* considered a narrow, unrelated issue; that is, whether the attorney-client privilege exists between a state agency and its in-house counsel when that counsel is not an assistant attorney general. The court held that those communications are privileged. Id. at ¶ 36. *Leslie* did not expressly or implicitly overrule *Awadalla*. Indeed, the court did not mention either *Awadalla* or the Open Meetings Act. Finally, *Leslie* does not stand for the proposition that an executive director or board member who is also an attorney can serve as the attorney for a board for purposes of discussing "pending or imminent court action" in executive session.

{¶ 69} Here, the board's official meeting minutes and the testimony of several board members demonstrate that Renner was present at the board meeting in his capacity as executive director, not as the board's attorney. Because the evidence does not support the argument that neither Renner nor any of the other attorneys present at the meeting were acting as legal counsel for the board, the trial court correctly found that the board did not convene in executive session to confer with "an attorney for the public body."

{¶ 70} Secondly, the motion does not cite "pending or imminent court action" as the reason for entering executive session. Rather, the motion states only that executive session was required "to consider confidential legal matters." The term "confidential legal matters" encompasses a myriad of subjects that may or may not be related to, or result in, court action. A finding that this statement was sufficient to satisfy the notice requirement of R.C. 121.22(G)(3) would render meaningless the express requirement that the matters the board intended to discuss in executive session were the subject of "pending or imminent court action." Thus, we conclude that a reference to "confidential legal matters" is insufficient to satisfy the notice requirement of R.C. 121.22(G)(3).

{¶ 71} Moreover, even if the board properly convened in executive session and discussed issues that may have qualified as discussions related to "imminent court action" if the board's attorney had been present, the board's discussions went well beyond this subject matter to basic policy decisions facing the board—topics that should have been discussed in open session. A resolution is invalid unless adopted in an open meeting of the public body. R.C. 121.22(H). Additionally, "[a] resolution, rule, or formal action adopted in an open meeting that results from deliberations in a meeting not open to the public is invalid unless the deliberations were for a purpose specifically authorized in division (G) * * * and conducted at an executive session held in compliance with this section." Id. As noted previously, the board discussed at length whether to transfer money from the endowment fund to an outside entity, the amount of funds to transfer, and potential recipients of the transferred funds. We do not agree with Legacy's contention that all these topics were inextricably entwined with the subject of imminent litigation. Assuming arguendo that the board's discussions about transferring funds to an outside entity qualified as related to "imminent court action," the board's specific discussions regarding the amount of funds to transfer and to whom to transfer the funds were not related to imminent court action and thus were required to be held in open session.

{¶ 72} " 'Deliberations' involve more than information-gathering, investigation, or fact-finding." *Springfield Loc. School Dist. Bd. of Edn. v. Ohio Assn. of Pub. School Emps., Local 530* (1995), 106 Ohio App.3d 855, 864, 667 N.E.2d 458, citing *Holeski v. Lawrence* (1993), 85 Ohio App.3d 824, 829, 621 N.E.2d 802. Deliberations involve the weighing and examining of reasons for and against a course of action. Id., citing Webster's Third New International Dictionary (1961) 596. See also *Theile v. Harris* (June 11, 1986), 1st Dist. No. C–860103, 1986 WL 6514 (*"after* a public body has obtained the facts, it *deliberates* by thoroughly discussing all of the factors involved, carefully weighing the positive factors against the negative factors, cautiously considering the ramifications of its proposed action, and gradually arriving at a proper decision which reflects this legislative process." [Emphasis sic]). "Deliberations involve a

decisional analysis, i.e., an exchange of views on the facts in an attempt to reach a decision." *Piekutowski v. S. Cent. Ohio Edn. Serv. Ctr. Governing Bd.*, 161 Ohio App.3d 372, 379, 2005-Ohio-2868, 830 N.E.2d 423. While it is permissible for a public body to gather information in private, a public body cannot deliberate privately in the absence of specifically authorized purposes. Id.

{¶ 73} Having reviewed the evidence in the record, we find that the board deliberated during the executive session on the issues of the amount of the endowment fund to transfer and to whom to transfer the funds. Indeed, several board members testified that the board took a straw poll during the executive session concerning the proposal to transfer $190 million to one or more of three outside entities. Renner testified that all the board members were asked to state their opinions on the transfer motion. In addition, several board members testified that a consensus formed during the executive session in favor of adopting the proposal set forth in the transfer resolution. The record indicates that there was absolutely no discussion by the board about the transfer resolution in the public session. Specifically, as previously noted, the meeting minutes indicate that following the motion and vote on the special-counsel resolution, one of the board members immediately moved to transfer $190 million of the endowment fund to one or more of the three entities discussed in executive session. At least two board members testified that there was no discussion on the motion during the public portion of the meeting. Given the absence of any public discussion by the board about the specifics of the transfer resolution, it is reasonable to conclude that the board's discussion regarding the amount and potential recipients of the transferred funds occurred during the executive session.

{¶ 74} However, evidence that a public body deliberated on a public issue in executive session does not automatically result in invalidation of a resolution. "Besides the act of deliberation, there must be proof of causation." *Springfield Local School Dist. Bd. of Edn.*, 106 Ohio App.3d 855, 865, 667 N.E.2d 458. Thus, there must be evidence in the record that the public body arrived at its decision on the matter as a result of the nonpublic deliberations. Id. at 863–864, 667 N.E.2d 458. Here, the meeting minutes reflect that the board did not discuss the transfer resolution in open session. At least one board member testified that the transfer motion made in open session resulted from discussions held during executive session. Accordingly, we agree with the trial court's finding that the board violated R.C. 121.22 by deliberating in executive session upon matters that it was required to discuss in open session.

{¶ 75} Legacy claims, citing *Jones v. Brookfield Twp. Trustees* (June 30, 1995), 11th Dist. No. 92–T–4692, 1995 WL 411842, and *Roberto v. Brown Cty. Gen. Hosp.* (Feb. 8, 1988), 12th Dist. No. CA87–06–009, 1988 WL 12962, that the attorney general waived its right to assert an Open Meetings Act violation by

failing to send an assistant attorney general to the board meeting. Neither case applies here. *Jones* involved board members using their own Open Meetings Act violation to invalidate their own actions. *Roberto* also involved board members seeking to invalidate their own board's action. Further, *Roberto* contained an additional equitable component: Roberto had relied upon the allegedly invalid employment agreement for five years. No such equivalent reliance exists here.

{¶ 76} As noted previously, the Open Meetings Act is designed to prevent public officials from "meeting secretly to deliberate on public issues without accountability to the public." *Cincinnati Post*, 76 Ohio St.3d at 544, 668 N.E.2d 903. As the Supreme Court of Ohio recognized: "One of the strengths of American government is the right of the public to know and understand the actions of their elected representatives. This includes not merely the right to know a government body's final decision on a matter, but the ways and means by which those decisions were reached." *White v. Clinton Cty. Bd. of Commrs.* (1996), 76 Ohio St.3d 416, 419, 667 N.E.2d 1223.

{¶ 77} After thoroughly reviewing the record, we conclude that the board violated R.C. 121.22 by improperly convening in executive session and by deliberating upon issues not raised in the motion to convene and that the resolution resulted from those nonpublic deliberations. Absent the transfer resolution, which is invalid as a result of the Open Meetings Act violation, Renner lacked authority to enter into the contract with Legacy. Accordingly, the contract between Legacy and the foundation is invalid and unenforceable. Having concluded that the contract between the board and Legacy is invalid and unenforceable as a result of the board's noncompliance with the Open Meetings Act, we need not consider the trial court's other reasons for finding the contract unenforceable.

{¶ 78} Given our conclusion that no contractual relationship exists between the board and Legacy, Legacy's constitutional impairment-of-contract claim necessarily fails. Accordingly, Legacy's cross-assignment of error is overruled.

{¶ 79} For the foregoing reasons, appellants' first, third, and fourth assignments of error are sustained, their second assignment of error is moot, and Legacy's conditional cross-assignment of error is overruled. We affirm the judgment of the Franklin County Court of Common Pleas denying declaratory and injunctive relief to Legacy but reverse the judgment granting declaratory and injunctive relief to appellees and remand these matters to the trial court for further proceedings consistent with this decision.

> Judgment affirmed in part
> and reversed in part,
> and cause remanded.

McGRATH, SADLER and TYACK, JJ., concur.